UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ANA CAROLINA VAZQUEZ, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:13-CV-1445-B |
| | § | |
| MARCO ANTONIO VASQUEZ, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner Ana Carolina Vazquez's Verified Petition Under Hague Convention for Return of Abducted Child (doc. 2), filed on April 11, 2013. The Court held a bench trial on August 14, 15, and 16 of 2013 to address the legal and factual issues in dispute with respect to the allegations in the Verified Petition. Both Petitioner and Respondent Marco Antonio Vasquez were represented by counsel and submitted arguments and evidence in support of their positions on the Verified Petition. For the reasons that follow, the Court **GRANTS** Petitioner's Verified Petition and **ORDERS** the **RETURN** of the child at issue, M.V., to Mexico.

## I.

## BACKGROUND

*A.    Procedural History*

On April 11, 2013, Petitioner filed her Verified Petition Under Hague Convention for Return of Abducted Child (doc. 2). The Verified Petition asserts that Respondent wrongfully removed and

retained M.V.,[1] a child born to the nonmarital union of Petitioner and Respondent, in violation of The Hague Convention on the Civil Aspects of International Child Abduction Oct. 25, 1980, 1343 U.N.T.S. 89 (the "Hague Convention"), and its implementing legislation, the International Child Abduction Remedies Act (the "ICARA"), 42 U.S.C. §§ 11601-11611. Petitioner alleges that, on June 16, 2012, Respondent abducted M.V. from Mexico, where M.V. had been residing for seventeen consecutive months, to the United States without Petitioner's consent. Along with the Verified Petition, Petitioner also filed a Motion to Seal Pleadings (doc. 3), which the Court granted. Doc. 9. Petitioner also filed an Ex Parte Motion for Temporary Restraining Order (doc. 4) which, as described below, the Court later dissolved after a hearing. Doc. 13.

The Court reviewed the request for a temporary restraining order on an expedited basis, ultimately issuing a sealed, ex-parte order under Federal Rule of Civil Procedure 65(b)(1) on April 11, 2013. Doc. 10, Order. The Court set the matter for an expedited hearing on April 23, 2013. At the hearing, the parties agreed that Respondent would not remove M.V. from the Court's jurisdiction. The Court therefore entered an order (doc. 13) dissolving the temporary restraining order based on the parties' agreement. Counsel was appointed for Respondent, who was given additional time to respond to the Verified Petition following an expedited scheduling order. Respondent filed his Answer (doc. 22), which he later replaced with an Amended Answer (doc. 23), filed on July 12, 2013. The Amended Answer disputed Petitioner's claim and offered three affirmative defenses under Article 13 of the Hague Convention: consent, grave risk, and mature child objection.

---

[1]M.V. was four years old when she was removed from Mexico and was five years old at the time of the trial.

The parties did not file dispositive motions but instead submitted the case to a bench trial. The Court held a bench trial on August 14, 15, and 16 of 2013. The Court heard the evidence, made evidentiary rulings,[2] and had the opportunity to observe the witnesses' demeanor and testimony first hand and make corresponding credibility determinations. At the close of Petitioner's case, Respondent moved for judgment under Federal Rule of Civil Procedure 52(c). The Court denied the motion. At the close of Respondent's case, Respondent renewed his motion for judgment under Rule 52(c). Petitioner also moved for judgment under Rule 52(c). The Court denied both motions.

The parties do not contest that this Court has jurisdiction pursuant to 42 U.S.C. § 11603.

B.    *Factual Evidence*

As in most child abduction cases brought pursuant to the Hague Convention provisions, there is little agreement between the parties as to the underlying facts. As such, the Court's credibility determinations have proven dispositive in deciding whether the parties have met their respective burdens of proof with regard to Petitioner's requested relief and Respondent's affirmative defenses. Because of the sheer volume of facts underlying this suit as well as the number of disputes over key portions of the events at issue (including the nature of the parties' relationship, their agreement regarding M.V.'s residence, and the critical events leading up to M.V.'s removal), the Court has arranged its summary of the facts in a timeline format. The disputed facts are so

---

[2]The Federal Rules of Evidence apply to Hague Convention cases. *See* 42 U.S.C. § 11605; *Karkkainen v. Kovalchuk*, 445 F.3d 280, 289 (3rd Cir. 2006); *Danaipour v. McLarey*, 386 F.3d 289, 296 (1st Cir. 2004); *Luedtke v. Luedtke-Thomsen*, No. 1:12-cv-750-WTL-TAB, 2012 WL 2562405, at *1 (S.D. Ind. June 29, 2012); *Avendano v. Smith*, No. 11-0556-JB/CG, 2011 WL 3503330, at *1 (D.N.M. Aug. 1, 2011).This is particularly important with respect to the hearsay rules and exclusions, given that wrongful removal and retention claims often involve he said/she said-type evidence. *See Lozano v. Alvarez*, 697 F.3d 41, 58 (2d Cir. 2012); *Karkkainen*, 445 F.3d at 289; *Danaipour*, 386 F.3d at 296; *Escaf v. Rodriguez*, 200 F. Supp. 2d 603, 608 n.13, 609 n.15 (E.D. Va. 2002).

designated. The Court's credibility determinations follow its rendition of the facts.

    i.    <u>M.V.'s Birth in the United States</u>

Petitioner is a Mexican citizen who was brought to the United States at the age of eight and remained in the United States from that time forward without proper documentation. Petitioner primarily lived in Texas during her residence in the United States. In 2004, Petitioner and Respondent, a United States citizen, met and began a romantic relationship. The two never married. Although they ended their relationship at some point in 2007, Petitioner learned she was pregnant and she and Respondent resumed their relationship. They lived together with Respondent's son from a previous relationship, M.G.V, at Respondent's parents' house and at a separate apartment.

M.V. was born in 2007 in the United States. M.V. is a United States citizen. She lived with Petitioner, Respondent, and Respondent's son from her birth until she was two years old. The parties testified that the relationship between Petitioner and Respondent was rocky, and they would break up for short periods of time. Petitioner and her sister, Diana Vazquez, testified that Petitioner would move in with her parents during these break-ups. According to Petitioner and Diana, M.V. remained in Petitioner's care during these periods, though Respondent stated that M.V. would spend some time with him during the break-ups. While living in Texas, M.V. frequently visited both Petitioner's and Respondent's families.

    ii.    <u>Petitioner's April 26, 2010 Removal to Mexico</u>

In January 2010, Petitioner was arrested at J.C. Penney for theft. M.V. was with Petitioner when Petitioner was arrested. At the time of the arrest, Petitioner called Respondent to alert him to the fact that she had been arrested and that he needed to pick up M.V. at the store. After some

time had passed and Respondent had not arrived, one of the police officers at the store called Respondent and told Respondent to come to the store. Respondent testified that he had to pick up his mother prior to picking up M.V. and that the drive to the store was long. The police officers would not wait any longer, took Petitioner with them, and left M.V. with a store employee. Upon Respondent's and his mother's arrival at the store, they found M.V. with the store employee with a soiled diaper.

After Petitioner's arrest, the immigration authorities discovered that Petitioner was unlawfully residing in the United States. Petitioner consequently remained detained with immigrations services from the date of her arrest until her removal to Mexico on April 26, 2010. Petitioner was removed to Mexico and immediately traveled to Linares, Nuevo Leon, Mexico to live with her grandmother, Rebeca Alanis, at Ms. Alanis' house. Petitioner has lived at Ms. Alanis' house in Linares from that date through the present. During Petitioner's detention and in the two months immediately thereafter, M.V. lived with Respondent.

    iii.    <u>M.V.'s July 2010 Travel to Linares, Mexico</u>

In July 2010, M.V. traveled from the United States to Linares, Mexico to stay with Petitioner and Ms. Alanis. Respondent's mother, Ramona Vasquez, took M.V. from the Dallas, Texas area to Mexico. Ramona testified that she had a letter from Respondent and a separate letter written by her, the latter of which was notarized by Ramona's sister-in-law Norma Rodriguez.[3] Apparently, when a

---

[3]The deposition testimony of Norma Rodriguez was admitted in lieu of live testimony. Norma and Ramona both testified that Respondent's letter was not notarized, though Ramona's letter was. Although both parties emphasized the matter of the letter, the fact that Respondent's letter was or was not notarized does not appear to have an outcome on the merits of this case. Further, because no party can remember the contents of the letters, the letters add little weight to the Court's analysis.

minor is traveling across the border without a parent, the minor must have a notarized letter signed by the parent permitting the child to cross the border and outlining where the child would stay and with whom the child would stay. Ramona and Respondent testified that one of their letters outlined a specific period of time that M.V. was permitted to be in Mexico. However, no party could recall the time period listed in the letters, and Petitioner no longer had the letters.

The testimony conflicted as to the amount of time that the parties intended for M.V. to remain in Mexico after the July 2010 trip. However, Petitioner admitted that she and Respondent had not decided M.V.'s length of stay. Petitioner testified that the plan at that time was for M.V. to be in Mexico, then go to the United States, then go back to Mexico, etc. The parties did agree that M.V. would remain in Linares with her mother and maternal great-grandmother until October 2010. Although M.V. was going back to the United States in October, Petitioner enrolled her in the first year of a three-year kindergarten program at the school in Linares where Petitioner was working as an English teacher.

iv.     M.V.'s October 2010 Travel to Texas, United States

In October 2010, Respondent went to Mexico with his friend, Lorenzo Dillon. Respondent and Lorenzo met up with Petitioner and M.V. in Reynosa, a city near the Mexican-United States border. The purpose of the trip was for Respondent to pick up M.V. and take her to Texas for a few months. Petitioner agrees that in October it was not altogether clear what M.V.'s living arrangements would be, but that the parties planned for M.V. to travel back to Mexico a few months later. Although other witnesses provided differing testimony, Petitioner and Respondent agree that M.V. remained in Texas from October 2010 through January 2011.

Dillon testified that, during this trip, he briefly chatted with Petitioner, who stated that she

was looking into the procedures and fines or fees necessary for her to return to the United States. Dillon's testimony was equivocal as to whether Petitioner was merely considering returning to the United States or had an actual plan to do so at that time, though nothing in his testimony indicated that Petitioner had a plan to return illegally.

          v.      <u>M.V.'s January 2011 Travel to Linares, Mexico</u>

On January 11, 2011, M.V., accompanied by Ramona Vasquez, traveled from the United States to Linares, Mexico. Ramona dropped M.V. off at the border with Petitioner's cousin, who then delivered M.V. to her mother's care. Ramona testified that she again brought a letter written by her, which was notarized by Norma Rodriguez, and a letter from Respondent permitting M.V. to travel for a specific period of time. However, no one remembered the dates of stay in the letter. When asked whether Ramona knew that M.V. would be remaining in Mexico, Ramona stated that she did not know. However, when asked whether Ramona gave M.V. any kind of special goodbye, Ramona admitted that she did.

Petitioner testified that at the time M.V. traveled to Mexico, Petitioner and Respondent did not yet have a set plan for how long M.V. would stay in each country. However, Petitioner testified that the plan was that M.V. would at stay in Mexico at least for the school year, since she was enrolled in school.

Respondent, in contrast, testified that he believed that M.V. would only stay in Mexico for a month or two or whenever he could afford her return. Respondent stated that he was unaware that M.V. was enrolled in and going to school until February or March. Respondent explained that he was angry that M.V. was in school because "she was too young." However, Respondent testified that he felt that there was nothing he could do about M.V. remaining in Mexico because of the school.

Respondent later elaborated that M.V. stayed in Mexico past the date that he believed she would return, because he was financially unable to travel to Mexico to retrieve M.V.

M.G.V, Respondent's son, also testified as to his understanding of M.V.'s January 2011 trip to Mexico. He testified that he believed M.V. was staying in Mexico for only two weeks to a month.

Outside of the parties' beliefs as to the length of time planned for M.V. to stay in Mexico after the January 2011 trip, Respondent admits that he did not document any request for M.V. to return to the United States or object to her remaining in Mexico until August 2011. Respondent and Petitioner remained in a romantic relationship during this period. Respondent also admits that, from the time M.V. traveled to Mexico in mid-January 2011 until Respondent's trip to Mexico in August 2011, Respondent did not visit Mexico.

The parties agree that M.V. remained in her mother's care in Linares, Mexico from January 2011 until Respondent's alleged wrongful removal of her in June 2012, approximately seventeen months.

vi.    Respondent's August 2011 Trip to Linares, Mexico

In August 2011, Respondent and his son took a trip to Linares, Mexico to Petitioner's and Ms. Alanis' home. On the second-to-last day of his visit, Respondent told Petitioner that he was taking M.V. with him back to the United States. Petitioner testified that she was unaware of Respondent's plan and immediately objected. During their argument Petitioner became extremely anxious, resulting in a panic attack. Petitioner's aunt, who was at the house at the time of the dispute, called one of Petitioner's uncles, who was a doctor, to come to the home. The parties dispute how many male relatives, described as "uncles" actually arrived. Petitioner claimed three,

Respondent claimed five (three came inside the home, two stayed outside), and Respondent's son claimed five to six.

Once Petitioner's male relatives arrived, Petitioner went to the bedroom to calm down while Respondent, his son, and the relatives remained in the living room to talk. Petitioner admitted that she could not hear what was said during the conversation because she was in the bedroom crying. However, Petitioner could hear enough to know that there was no yelling, except from Respondent. Respondent, on the other hand, stated that the uncle who was a doctor was screaming. The uncle allegedly stated that Respondent was not going to take M.V. and that was "final." Another uncle also stated that Respondent was not going to take M.V. Respondent testified that he held his own during the argument, stating that Petitioner's kin could not tell him what to do since Respondent was M.V.'s father (and thus the decision maker). Respondent stated that the relatives did not physically threaten him. However, Respondent testified that he "felt threatened" to the extent that the relatives told Respondent that M.V. would stay in Mexico because Petitioner could not visit M.V. if M.V. were to move to the United States, due to her immigration status. Respondent's son, who was present during the discussion, testified that he felt physically threatened, although he admitted that none of the men actually threatened him. Both Respondent and his son alleged that they feared that the relatives would call the police.

Petitioner stated that, after her male relatives left the home, she and Respondent had a conversation about M.V.'s place of residence. Petitioner alleged that Respondent asked why she was so upset. Petitioner explained that she was upset because Respondent was saying that he was going to take M.V. to the United States to live permanently. Based on the day's events, Respondent left a day early from Linares, but when he arrived at the bus station, the bus had already left. Respondent

thus decided to stay an extra day with Petitioner and M.V. That night, Petitioner, Respondent,

Respondent's son, and M.V. went to a local carnival.

Petitioner testified that, prior to Respondent's return to Texas the next day, she and

Respondent again tried to reach an understanding with respect to M.V. Petitioner explained to

Respondent that M.V. was in school and, more importantly, both parents could see M.V. if M.V.

lived in Mexico but Petitioner could not see M.V. if M.V. lived in the United States, given that

Petitioner's immigration status prevented her from returning to the country. Petitioner testified that

the parties therefore came to an agreement that Petitioner that M.V. would permanently remain in

Mexico. Respondent admitted that he and Petitioner "were trying to come to an agreement."

Respondent also admitted that he ultimately allowed M.V. to remain in Mexico. However,

Respondent testified that he felt that he had no choice since M.V. was enrolled in pre-school in

Mexico. The next day, Respondent and his son returned to the United States without M.V.

Soon after Respondent left Mexico in August 2011, Petitioner broke off their romantic

relationship. Respondent testified that the relationship changed after the August 2011 visit, but that

the parties did not break up. He stated that from that point, he invested more effort in attempting

to have a romantic relationship with Petitioner. In September 2011, Respondent sent Petitioner

pictures of engagement rings. Pet. Ex. 15. Petitioner testified that she did not want to get married

and had rejected Respondent's proposals. In sum, the testimony demonstrated that the parties

strongly diverged as to the status of their relationship after August 2011.

    vii.    <u>Respondent's November 2011 Trip to Linares, Mexico</u>

In November 2011, Respondent and his son traveled back to Linares for M.V.'s four-year-old

birthday party.[4] During the visit, Respondent and Petitioner fought about the presence of Petitioner's male friends who had attended the birthday party. Respondent alleged that he had raised the subject of M.V.'s residence to Petitioner prior to the November trip, but he was not clear as to whether they actually discussed the issue during this trip. For her part, Petitioner testified that during this November visit, Respondent did not bring up the issue of M.V. moving to the United States.

It was also around the time of this trip that Respondent admitted that he began to pay for M.V.'s care in Mexico. Although he had sent money to Petitioner and M.V. on previous occasions, he admits that he had not provided much monetary support until late 2011.

viii.   Respondent's December 2011 Trip to Linares, Mexico

On December 7, 2011, Respondent and one of his cousins discussed via e-mail M.V.'s return to the United States. Respondent admits that he talked to his cousin about "tricking" Petitioner by pretending to want to be a family again and taking M.V. back to Texas for a short period of time. The cousin suggested that Respondent then just not return M.V. to Mexico. Respondent admitted on cross examination that he said "yeah that's what I will do." The e-mail messages admitted in evidence confirm that, in response to the cousin's statement "trick her and act like you want to be a family again to get [M.V.] and just keep her," Respondent stated, "Im trying to do that." Pet. Ex. 48. Respondent also obtained a copy of M.V.'s birth certificate the day before he went to Mexico in December 2011, in order to have the proper documentation to take M.V. across the border.

On December 24, 2011, Respondent and his son took another trip to Linares, Mexico to celebrate the Christmas holiday. Respondent, his son, Petitioner, and M.V. went to a family rosary

---

[4]M.V.'s birthday is in 2007, but Petitioner and Respondent decided to have a large birthday party for her and could not schedule it until November.

and two family Christmas parties. Respondent testified that Petitioner drank alcohol in excess that night. Respondent also testified that he told Petitioner that M.V. would be going back with him to the United States and Petitioner could come along but that Petitioner thought that she would not be allowed back in the United States. According to Respondent, during their first few conversations that night, Petitioner said that she did not want to talk about M.V. going to the United States. Later, Respondent proposed marriage to Petitioner, but Petitioner was equivocal. Respondent testified that he still believed that they would eventually get married. He described their conversation regarding their relationship in detail. Respondent also briefly testified the couple agreed on M.V. going to the United States. He did not testify as to what the agreement entailed in terms of how long M.V. would be in the United States, when she would go there, etc.

Respondent's son, M.G.V. testified that, at the Christmas party, Respondent asked Petitioner if M.V. could go to the United States for Christmas if Respondent would bring her back during the New Year's holiday. M.G.V. stated that Petitioner was not sure, but that an aunt convinced Petitioner to allow it. He also admitted that he did not understand a lot of the conversation, because the conversation was in Spanish and he is not fluent in that language.

Petitioner denies that the parties ever discussed M.V. going to the United States. Petitioner testified that the topic of conversation was only about Respondent wanting to marry Petitioner, which Petitioner did not want to do.

The parties testified that they returned to Petitioner's home around 3am or 4am on Christmas morning. According to Petitioner, Respondent wanted to continue to talk about their relationship and to argue about whether Petitioner had a boyfriend, but Petitioner did not want to argue and went to bed. Respondent testified that after their conversation, the couple had sexual

relations and that he believed they were in a romantic relationship again. The parties agree that, around 6am, only two or three hours after they went to bed, Respondent awoke to prepare for his travel back to the United States. Respondent alleges that he attempted to awaken Petitioner, but that she was hungover and could not get out of bed. Respondent did *not* state that he told Petitioner that morning that he was taking M.V. with him. Instead, Respondent states that Petitioner refused to get out of bed to say goodbye to him. Petitioner alleges that she was not awakened before Respondent left.

Respondent testified that he then packed M.V.'s items and then he, his son, and M.V. took a taxi to the bus station and then boarded a bus for the United States. Petitioner testified that she woke up around 10:30am and was surprised to see that Respondent, his son, and M.V. were gone. She testified that she was "in shock." Petitioner immediately called the bus station to confirm that Respondent had gotten on the bus. Petitioner's uncle drove her to the federal highway police, where they reported that M.V. had been abducted by Respondent. Petitioner gave the police the bus number, and the police caught up and stopped the bus two towns into its route. Respondent confirmed that, during one of the stops on the bus ride back to the United States, the Mexican police found Respondent and held M.V., Respondent, and Respondent's son at that stop.

After the police confirmed that they had stopped Respondent, Petitioner's uncle drove her to the location where Respondent, his son, and M.V. were being held. At that time, Petitioner and Respondent spoke with the police. The parties argued, disputing whether M.V. was allowed to go to the United States and whether Petitioner had consented to it. Petitioner alleged that she had not consented to it and asked Respondent why, if she had consented, did he fail to disclose M.V.'s departure and prevent Petitioner from saying goodbye to M.V. The police told the parties that the

police could not resolve the conflict, so Respondent and Petitioner had to come to an agreement between themselves regarding M.V. or they would both go to jail. Respondent testified that Petitioner was willing to go to jail, but he was not, so he had no choice but to allow Petitioner to take M.V. In contrast, Petitioner testified that, after their discussion, Respondent admitted that he "did wrong" and that Petitioner should keep M.V. Ultimately, Respondent agreed to leave M.V. in Mexico. He and his son took a second bus back to the United States.

According to Respondent, soon after the Christmas Day incident, he investigated filing a Hague Convention claim.[5] He acknowledged receiving some paperwork, but never actually filed a claim. He stated that he ultimately did not follow through with the petition in hopes that he could pursue a romantic relationship with Petitioner, for fear that Petitioner would hide M.V. from him, and because of the prohibitive expense of hiring an attorney.

> ix.   Respondent's Custody Filing and March 2012 Trip to Monterrey, Mexico

Two months after the 2011 Christmas visit, in February 2012, Respondent retained an attorney and filed a custody case in Texas state court, seeking full custody of M.V. The Texas court required that Respondent serve Petitioner with process or submit an affidavit stating that he was unaware of Petitioner's whereabouts. Despite having stayed at Petitioner's house in Mexico about one week prior, Respondent signed an affidavit on January 3, 2012 (prior to filing his custody petition) stating that he was unaware of Petitioner's whereabouts or her last known address. Pet. Ex. 17. Respondent did not inform the Texas court that he was in constant communication with Petitioner throughout the custody proceedings, and even sent flowers to her home several times in

---

[5]Respondent originally stated that he received paperwork in April 2012, but later stated it was April 2011.

2012 while the custody proceeding was ongoing.

The Texas court hired an attorney ad litem for Petitioner, and Respondent was required to give the attorney ad litem all information he had to locate Petitioner. The attorney ad litem, Melissa Dossey, testified at trial. She stated that she was given Petitioner's name, including a last name spelled "Vasquez,"[6] and some basic biographical information. Ms. Dossey testified that Respondent never gave her Petitioner's phone number or address. Respondent testified that he gave someone at the Texas court, perhaps his attorney or the ad litem, google images of Petitioner's house in Mexico, but Ms. Dossey testified that she did not receive those images. Ms. Dossey also testified that Respondent failed to mention to the Texas state court that he had been in constant communication with Petitioner throughout the course of the proceedings. Respondent does not dispute that he did not tell Petitioner of the proceedings. He testified that he forgot Petitioner's address and forgot that he had her address stored in some of his accounts. Respondent tried to justify his failure to inform the Texas courts that he was in contact with Petitioner by stating that he thought the Texas court was only asking for Petitioner's exact address, not whether she could be contacted by other means, and that he did not actually know if Petitioner was living with her grandmother in their house in Linares at the time.

In March 2012, Respondent and his son took a trip to Mexico to see Petitioner and M.V. and to have a vacation. The parties met in Monterrey, Mexico, because Petitioner's family no longer welcomed Respondent in Linares. Respondent did not inform the Texas court that he was meeting

---

[6]Petitioner's last name is spelled with two z's: Vazquez. Respondent's last name is spelled with one s and one z: Vasquez. Thus, the name given for Petitioner by Respondent to the Texas court was misspelled, likely hindering the ability of the court to track down Petitioner.

Petitioner in person. During the March trip, Respondent failed to inform Petitioner about the Texas custody proceedings nor did he serve her with the papers from the custody case.

      x.      <u>Respondent's May 2012 Trip to Monterrey, Mexico and Texas Custody Order</u>

In May 2012, Respondent and his son again took a trip to Monterrey to visit with Petitioner and M.V. Respondent again did not serve Petitioner with the custody case papers nor did he inform the Texas court that he was going to meet Petitioner in person.

The *day after* Respondent left Monterrey, he appeared before a Texas court in the custody proceedings, telling the Texas court for the first time that Petitioner was in Mexico but stating that he did not know where Petitioner was living. Respondent stated that he also told the Texas court that M.V. was in Mexico, but Ms. Dossey testified that Respondent never mentioned that M.V. was also in Mexico.[7] Because Ms. Dossey was not told that Petitioner lived in Mexico until the final hearing, after she had already run her searches and prepared her report stating that Petitioner could not be found, she never searched Mexican records for Petitioner. According to Ms. Dossey, Respondent's attorney also seemed surprised at learning of the possibility that Petitioner was in Mexico.

All parties agree that Petitioner was not made aware of the custody proceedings until after the proceedings were complete. All parties appear to agree that Respondent did not inform the Texas court that he was in constant communication with Petitioner, including seeing her in person in March and May while the custody case was ongoing and while the Texas court was attempting to

---

[7]Texas courts have jurisdiction to decide custody disputes only if the child at issue resided in Texas within six months prior to the custody proceedings, *see* Tex. Fam. Code § 152.201, which was not the case here.

determine Petitioner's whereabouts in order to include her in the proceedings. Ultimately, the Texas court could not serve Petitioner with the custody proceedings and Petitioner was unable to participate in those proceedings. Respondent left the Texas courthouse that day with a custody order appointing him as sole managing conservator over M.V.[8]

      xi.      <u>Respondent's June 2012 Trip to Reynosa, Mexico and M.V.'s Travel to Texas, United States</u>

Respondent's next trip to Mexico was in June 2012. His son accompanied him on the trip. The parties agree at the very least that the plan was for Respondent, his son, Petitioner, Petitioner's uncle, and M.V. to meet in Reynosa so that Respondent could buy a car with Mexican plates for M.V. and Petitioner, give Petitioner money, and visit with M.V. The parties hotly dispute whether the plan also involved M.V. traveling back to the United States with Respondent and his son. The evidence shows that Petitioner was afraid to take M.V. on the trip to Reynosa, due to the dangerous nature of the roads between Linares and Reynosa. Pet. Ex. 18.

Respondent testified that he and his son arrived in Reynosa around 8:00am in the morning and checked into the hotel. Petitioner, M.V., and Petitioner's uncle arrived around 10:00am, dropped off their things at the hotel, and then all went to eat at Burger King. Respondent stated that they were supposed to look at a car at 3:00pm, but the time changed to 6:00pm. When Respondent informed Petitioner and her uncle about the time change, Respondent alleges that a dispute began about the money and the car. Respondent alleges that he told Petitioner that he would not give her the cash until he "secure[d] himself with [M.V.]" Petitioner also stated that Respondent began

---

[8]It is important to note that Respondent does *not* claim that the Texas custody order entitled him to remove M.V., gives him an affirmative defense, or strips this Court of jurisdiction over this matter.

arguing with her because he thought she was staring at some teenaged boys who had walked past them at the restaurant. The parties left Burger King and went back to the hotel.

As recounted below, the parties' and witnesses' versions of events diverge significantly at this point.

### 1. Petitioner's Version of Events

Petitioner alleges that, upon their return to the hotel, Respondent announced that he was going to take a shower and a nap in the hotel room. Petitioner and her uncle said they were going to stay outside of the hotel to smoke. Respondent then told his son to follow him, and Respondent grabbed M.V.'s hand and told her to go along as well. M.V. turned around and looked at Petitioner, and Petitioner told M.V. to go to the room and Petitioner would be right up. Petitioner and her uncle remained outside at the front doors to the hotel. After a few minutes, Petitioner states she sensed that something was wrong. She went up to the hotel room and knocked on the door, but no one answered and she did not hear anyone in the room. Petitioner called and sent text messages to Respondent's cell phone multiple times, but Respondent did not respond. Finally, Respondent sent Petitioner a text saying that M.V. had wanted some treats so he had taken her to a store. Petitioner asked where the store was, and Respondent replied that it was a block to the front right of the hotel. Petitioner proceeded to that location, but there was no store. She saw a large grocery store across the street, so she went to the grocery store thinking that Respondent's directions had been incorrect. She stated that she asked the guards at the store if they had seen Respondent, his son, and M.V., but they had not. At that point, Petitioner returned to the hotel and asked the guards if they had seen Respondent, but they had not. Petitioner then discovered a door at the back of the hotel leading to the garage and parking lot. The guard at the back of the hotel also had not seen Respondent leave.

Neither had the workers at the reception desk. About an hour had passed by that point, and Petitioner continued to call and text Respondent looking for M.V. Petitioner then sent a message threatening to call the police if Respondent did not return within five minutes, and Respondent replied to the message stating that she should not contact police and he would be there. Respondent did not return. Petitioner saw a truck of military men nearby and stopped the truck and told them her story. The men suggested that Petitioner go to the border.

Petitioner took a taxi to the border, discovering that it was only three or four blocks from the hotel. She told the military guards at the border what was going on and gave Respondent's description. The guards stated that they would call her if they saw anyone. They suggested that Petitioner go to the American side of the border, which she did. She went into the American office and spoke to a customs worker, who called the local Hidalgo police department. An officer arrived and Petitioner explained what had happened. The officer stated that too much time, approximately two or three hours, had passed since Respondent likely crossed and there was nothing the police could do at that time. The officer suggested that Petitioner return to the Reynosa police station to report the abduction, since the incident happened in Reynosa.

At that point, Petitioner went to the Reynosa police department. The police directed her to the Attorney General's Office of the Family Division. That office, however, was not open until Monday, two days later. Petitioner returned to the hotel and continued calling Respondent from her phone and from the hotel room phone. She called Respondent's mother and Respondent's son, but did not hear back from them. She then enlisted her family to attempt to contact Respondent.

Petitioner's sister, D.V., testified that she and her other sister, B.V, sent text messages to Respondent asking about the whereabouts and well being of M.V. on the day she

was removed. Petitioner presented text messages from D.V. and B.V. to Respondent on the night of M.V.'s removal, stating that the family was "panicking" and "crying [and] crying" and asking "[w]hy are you doing this we trusted you." Pet. Ex. 21. Respondent told D.V. and B.V. to stop calling. He also required them to get Petitioner's facebook password and for Petitioner to unblock him from facebook in order for Petitioner to be allowed to speak with M.V. Respondent told them that Petitioner was running around with friends and other men and that Petitioner and her family did not care about Respondent and his family. D.V. and B.V. asked, "What happen[ed] to [M.V.]??" Pet. Ex. 21. Respondent later stated, that M.V. was "ok." *Id.* Respondent also stated D.V. and B.V. "have no idea what [Petitioner] was doing to me" and "only if u knew what ur sister was doing," explaining that he gave Petitioner money but Petitioner still treated him poorly.

By 2am or 3am in the morning, Respondent finally responded to Petitioner through a text message, telling Petitioner to leave him alone and let him sleep and that M.V. was "home." Petitioner asked what that meant, and Respondent replied that Petitioner should let them sleep, they were home, and there was nothing Petitioner could do about it.

Petitioner returned to Linares from Reynosa the day after M.V.'s removal. Petitioner's grandmother, R.A., testified that Petitioner was "distraught" and "crying" when she returned home from Reynosa. That Monday, Petitioner went to work and immediately informed her supervisor that she needed to take off work to file an abduction report with the Attorney General's office in Reynosa. Her supervisor permitted her to take time off work, and the next day, Petitioner traveled to the Attorney General's office in Reynosa to file the abduction report.

  2.    *Respondent's Version of Events*

In contrast to Petitioner's testimony, Respondent describes the following significantly less

detailed account of the foregoing events. Upon returning to the hotel from the Burger King, M.V. had to use the restroom, so Respondent's son took her inside the hotel. Petitioner walked inside the hotel with Respondent, and Respondent walked outside the hotel with Petitioner. They argued about the money and the car. According to Respondent, he said that he was leaving. He had allegedly done this in the past and never actually left, but "this time . . . called her bluff." He recounted that Petitioner allegedly told him to do whatever he wanted, but that she needed to receive the money. Importantly, Respondent did not testify that during this conversation he told Petitioner that he was taking M.V. with him. Respondent described taking M.V. and his son to the back of the hotel and the three of them taking a taxi to the border.

Respondent admitted that he received text messages from Petitioner after leaving Mexico with M.V. He alleged that the text messages questioned why he left Mexico, which Respondent interpreted to be asking why he did not buy Petitioner the car or leave her cash. Respondent did not testify about whether or not he received any messages related to M.V. or whether he interpreted any messages to be about M.V.

3.   *Other Witnesses' Accounts*

M.G.V testified that, after returning from the Burger King, he saw his father give Petitioner money and then his father asked M.V. if she was "ready to go." At that point, M.G.V. testified that he left to play with M.V. in the hallway. He stated that Respondent and Petitioner were inside the hotel and that he heard Petitioner say that M.V. could return to the United States. He believed that Petitioner was also coming to the United States later because Petitioner and Respondent "were supposed to get married." He testified that he heard Respondent say goodbye to Petitioner, but then admitted that he was not within hearing distance because he was inside the

hotel while Respondent and Petitioner remained outside. (It is unclear from his testimony who was inside and who was outside the hotel.) M.G.V. also admitted that his understanding of the deal that M.V. would return to Texas was based on "parts and bits" of what he understood from the Spanish conversation.

According to M., when Respondent returned to the United States on the same day that he left, Respondent's mother Ramona testified that was "surprised" that Petitioner "let [M.V.] come."

xii.   <u>After M.V.'s June 2012 Removal to the United States</u>

Petitioner alleges that Respondent eventually communicated with her after M.V.'s removal. According to Petitioner, Respondent would tell Petitioner that she was never going to see M.V. again and there was nothing that Petitioner could do about it. A week after M.V.'s removal, Petitioner filed her application for a Hague Convention petition.

Petitioner stated that Respondent threatened Petitioner to resume a relationship with him or marry him and to come back to the United States illegally if Petitioner wanted to talk to or see M.V. Petitioner described Respondent's threats as blackmail and admitted that she would sometimes do as Respondent's asked in order to talk to M.V. The evidence, including messages from Respondent, reflect a constant stream of degrading statements including name-calling, threats, and derogatory comments about Petitioner and her life choices. Respondent claims that after his removal of M.V. to the United States, he still believed that he and Petitioner were getting married. Respondent has continued to send money to Petitioner in Mexico since his removal of M.V.

The evidence also demonstrated that Respondent has permitted Petitioner's family in Texas

States. Petitioner's sister, D.V., stated that she could contact Respondent to see M.V. but had not, explaining that she was not comfortable communicating with Respondent. She sobbed on the witness stand as she testified that Respondent had threatened to hire men "to rape her" and her sister Becky, threatened to plant drugs in Diana's father's car, and threatened to call immigration services about Diana's family. Electronic evidence showed that in February 2013, Respondent threatened to contact immigration services regarding Petitioner's family in the United States and threatened to call child protective services to take Petitioner's sister's baby. Pet. Ex. 27.

Petitioner's immigration status prevents Petitioner from traveling to the United States to visit M.V. Respondent has not taken M.V. to Mexico nor allowed Petitioner to see M.V. since the date he removed M.V. from Mexico, in June 16, 2012, over one year and two months ago.

C.      *Credibility Determinations of Fact Witnesses*

During the bench trial, the Court had the opportunity to observe the demeanor of the witnesses and assess their credibility at length. Although Petitioner appeared via video conference, it did not hamper the Court's ability to assess her credibility as a witness or to judge the reasonableness of her version of events. As summed up below, between Petitioner and Respondent, Petitioner was the far more credible witness and her version of events much more reasonable and believable than Respondent's. The Court's credibility determinations and factual findings follow.

i.      Petitioner

Petitioner provided extensive testimony and factual detail in support of her claim. Because she testified via video conference,[9] there were intervals when she could not hear questions, but that

---

[9]Petitioner's immigration status prevents her from returning to the United States, so Petitioner was permitted to testify via video conference from Mexico.

problem was remedied by having the attorneys repeat their statements. Petitioner was fluent in the English language. Petitioner's demeanor appeared sincere and her rendition of events unflinching over the lengthy course of her testimony. Her testimony was consistent within itself, comported with her prior statements, and was consistent with the documented evidence in this case. Her recollection of the events that transpired from M.V.'s birth up until the trial was complete without any gaps, it was reasonable, logical, and made sense. Further, Petitioner willingly admitted her regrettable shoplifting episode. She maintained her credibility through the cross-examination, where she provided consistent and reasonable explanations for the questions asked of her with respect to the events in question. The Court found Petitioner to be a highly believable witness, strongly invested in the well-being of M.V. She appeared–in stark contrast to Respondent–much more aligned with getting the truth before the Court than tied to an ironclad factual rendition.

ii.   <u>Respondent</u>

Respondent also provided a significant amount of testimony and evidence during the bench trial. From the outset, Respondent's credibility was strained by a somewhat disjointed, inconsistent, and unreasonable rendition of events. He was unclear on crucial details and dates, and portions of his story simply did not make sense in view of the record. Respondent appeared more interested in describing his ongoing relationship strife with Petitioner and relating his view of her shortcomings than he was focused on describing the parties' arrangement regarding M.V.'s custody.

Respondent's testimony was inconsistent with his prior statements to this Court. In fact, Respondent's version of events at trial differed from his testimony before this Court during the hearing on the motion for a temporary restraining order and conflicted with his sworn deposition testimony. Respondent admitted during the trial that he had previously given incorrect information

to Petitioner's counsel as to whether he made certain trips to Mexico, stating that the details he had previously given were "details that were supposed to happen" but did not actually happen. Respondent nonetheless admitted at trial on cross-examination that he had remembered incorrect information stating, "I did say that but I believe I was getting my stories mixed." He made vague statements with regard to his differing testimony, stating, "I could remember the time, I just can't remember the event."

During the hearing on Petitioner's motion for temporary restraining order, Respondent, who was not represented by counsel at the time, stated that he allowed M.V. to visit Petitioner in Mexico for a month or two weeks at a time, that M.V. had been back and forth to Mexico three times, and offered various other time frames that are directly contradictory to his testimony during trial. He also indicated to the Court during the injunction hearing that he had provided Petitioner with the Texas state court custody papers after which Petitioner allowed M.V. to go with Respondent to Mexico. Respondent abandoned that position during the bench trial. An additional inconsistency occurred when Respondent, at the hearing on his motion for injunctive relief, told the Court that he dropped his own Hague Convention claim because he had M.V. in his possession. This statement is directly at odds with his bench trial testimony that M.V. was not in the United States while Respondent was considering a Hague Petition.

Respondent's deposition testimony provided yet another variation on his trips and corresponding dates to Mexico. At trial, for the first time, his recollection of dates and trips was consistent with Petitioner's recollection. It strains credulity to believe that Respondent had merely forgotten the dates or was confused when he presented the different recollections of events.

A key issue in this case was the events surrounding M.V.'s removal from Mexico in June

2012. Respondent's testimony as to this trip was disjointed and contradictory to the documented evidence and simply not believable.

Further eroding his credibility, Respondent refused to concede certain statements that he made or actions that he had taken, despite the fact that the documented evidence, the validity of which he did not dispute, proved otherwise. Especially noteworthy is Respondent's dubious refusal to admit that he had made misrepresentations or omissions to the Texas state court about Petitioner's whereabouts during his custody proceedings.

Finally, Respondent refused to admit the nature of statements he made about Petitioner both in and outside of M.V.'s presence. Voxer audio recordings that were sent from Respondent and M.V. to Petitioner were admitted in the record. Hundreds of email, facebook, and other electronic messages were also admitted in the record. Review of these recordings and messages reveal a litany of disparaging name-calling and comments, various threats, negative statements about Petitioner's lifestyle choices and physical appearance, etc. When asked on direct examination whether Respondent regretted saying these things, he agreed he did. He also agreed that he has spoken poorly about Petitioner in front of M.V. However, Respondent stated that, as to one occasion during which he especially spoke poorly of Petitioner to M.V.: "I want to call it a joke." The well-documented tirades by Respondent against Petitioner belie any light-hearted intentions on his part, particularly in view of the fact that many of the demeaning statements toward Petitioner were made in the presence of M.V.

iii.    Petitioner's Supporting Witnesses

Diana Vazquez, Petitioner's sister, also testified in support of Petitioner's case. She appeared credible and earnest in her answers and in her believable description of the family's ordeal following

Respondent's removal of M.V. from Mexico.

Petitioner's grandmother, R.A., provided some testimony through an interpreter. R.A. could not remember much and had trouble understanding some of the questions. She did not provide much significant testimony.

Melissa Dossey, the attorney ad litem appointed on behalf of Petitioner in Respondent's Texas custody case, provided testimony that reinforced Petitioner's claim that Respondent had purposefully avoided notifying the Texas state court of Petitioner's whereabouts. Ms. Dossey was otherwise a neutral but credible witness.

iv.    Respondent's Supporting Witnesses

Respondent's son, M.G.V., age seventeen at the time of trial, testified in support of Respondent's case. Throughout his tentative testimony, it was clear that M.G.V. was unable to remember dates, the number of trips taken to and from Mexico, and who took trips to Mexico. His recollection of dates and trips was consistent with Respondent's earlier recollection, which Respondent himself rejected at trial. Additionally, at times M.G.V. would testify that he witnessed certain events and heard certain statements from Petitioner and others, but on cross- examination would admit that he was either away from the place where the events occurred, was not within hearing distance, or could not understand the conversations because he was not fluent in Spanish. M.G.V. also gave conflicting accounts of his own recollection, especially with respect to the June 2012 removal of M.V. No doubt influenced by his father, M.G.V. continued to believe that Respondent and Petitioner were going to be married, when it was clear that that was not the case despite his father's desires. Based on Marco's conflicting stories, lack of memory, and his demeanor when answering questions both during direct and cross examination, the

Court concludes that M.G.V. was not a credible witness.

Lorenzo Dillon, Respondent's friend and former co-worker, also testified in support of Respondent. Mr. Dillon's testimony was not very significant in this case, as he did not provide much relevant information. Although he only accompanied Respondent to Mexico on one trip, in October 2011, Mr. Dillon recalled other trips that Respondent had taken to Mexico. Mr. Dillon's recollection was again consistent with Respondent's original story of his travels to Mexico, but Respondent himself admitted that he had not remembered the trips correctly. The fact that Mr. Dillon and M.G.V. recalled a timeline identical to Respondent's original timeline, which Respondent now admits was incorrect, evidences an attempt by Respondent and his witnesses to come up with consistent stories, regardless of the accuracy of the facts presented. In addition, it appeared that Mr. Dillon did not have a clear understanding of the nature of the relationship between Respondent and Petitioner, as he incorrectly believed that they either were married or had once been married. He also thought that Petitioner was living in Monterrey, Mexico, which was not the case. Accordingly, Mr. Dillon was not a particularly helpful or credible witness.

Respondent's mother, R.V., also testified. Although she did not provide much significant testimony, her demeanor when answering one key question, whether she knew M.V. would not return to the United States when she dropped M.V. off in Mexico in January 2011, demonstrated that R.V. was not comfortable with the question or her answer.

## II.

## ANALYSIS

A.     *Petitioner's Prima Facie Case*

The Verified Petition raises a single claim for wrongful removal and retention of a child under

-28-

Article 3 of the Hague Convention. The United States Supreme Court recently outlined the

standards for a claim for wrongful removal and retention under Article 3 of the Hague Convention:

> Article 3 of the Convention provides that the "removal or the retention of a child is to be considered wrongful" when "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."

*Chafin v. Chafin*, 133 S. Ct. 1017, 1021 (Feb. 19, 2013) (citing Article 3); *see Larbie v. Larbie*, 690

F.3d 295, 307 (5th Cir. 2012); *Redmond v. Redmond*, No.12-2511, 2013 U.S. App. LEXIS 15120,

at *20 (7th Cir. July 25, 2013). Pursuant to the Supreme Court's direction, the *prima facie* elements

of an Article 3 Hague Convention claim for wrongful removal and retention require a showing that:

(1) "the respondent removed or retained the child somewhere other than the child's habitual residence"; and

(2) "the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws"; and

(3) "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."

*See Larbie*, 690 F.3d at 307. A petitioner must prove each of these elements by a showing of

preponderance of the evidence. *Id.* The Court will evaluate Petitioner's ability to meet her burden

of proof on these three elements, in turn, below.

 i. <u>Habitual Residence</u>

  A petitioner's first hurdle in proving wrongful removal and retention under the Hague

Convention requires that the petitioner prove by a preponderance of the evidence the country of the

child's "habitual residence." With respect to the "habitual residence" element of an Article 3 claim,

the Fifth Circuit recently clarified:

We join the majority of circuits that "have adopted an approach that begins
with the parents' shared intent or settled purpose regarding their child's residence."
*Nicolson* [*v. Pappalardo*], 605 F.3d [100,] 104 & n. 2 [(1st Cir. 2010)] (collecting
cases). This approach does not ignore the child's experience, but rather gives greater
weight to the parents' subjective intentions relative to the child's age. For example,
parents' intentions should be dispositive where, as here, the child is so young that "he
or she cannot possibly decide the issue of residency." *Whiting* [*v. Krassner*], 391 F.3d
[540,] 548-49 [(3d Cir. 2004)] (citing English case that looked to parents' intentions
because the child was "two and one-half years old at the time of her abduction").

In such cases, the threshold test is whether both parents intended for the
child to "abandon the habitual residence left behind." *Mozes* [*v. Mozes*], 239 F.3d
[1067,] 1075 [(9th Cir. 2001)]; *see also Whiting*, 391 F.3d at 549-50. Absent shared
intent, "prior habitual residence should be deemed supplanted only where 'the
objective facts point unequivocally' to this conclusion." *Mozes*, 239 F.3d at
1082 (citation omitted). Notably, when "the child's initial move from an established
habitual residence was clearly intended to be for a specific, limited duration, most
courts will find no change in habitual residence." *Whiting*, 391 F.3d at 549 (holding
that a change in habitual residence had occurred because the parents had a written
agreement that the child should reside in Canada, not New York, at the time the
petition was filed); *see also Mozes*, 239 F.3d at 1077 & n.27 (collecting cases). Mere
retention in another country and "private reservations" or intentions that are made
"manifest and definitive" only after the child has left its country of origin are generally
insufficient to establish intent to change a child's habitual residence. *Nicolson*, 605
F.3d at 104.

*Larbie*, 690 F.3d at 310-11 (internal alterations omitted). "Habitual residence is intended to be a

description of a factual state of affairs, and a child can lose its habitual attachment to a place even

without a parent's consent." *Mozes*, 239 F.3d at 1081; *see Gallardo v. Orozco*, No. MO-13-CV-00024-

DC, 2013 WL 3803905, at *5-6 (W.D. Tex. July 22, 2013). Where there is no shared parental intent

to change the habitual residence and where there "are not unequivocal facts demonstrating [the

Child] nevertheless became acclimated [to the country]," the original habitual residence applies.

*Headifen v. Harker*, No. A-13-CA-340-SS, 2013 WL 2538897, at *10 (W.D. Tex. June 7, 2013). In

one case, a court held that the parents never had any shared, settled intention about the child's

habitual residence, and therefore considered whether the child was "highly acclimatized" to the

country that she was residing in at the time of the alleged wrongful removal. *Saldivar v. Rodela*, 879

F. Supp. 2d 610, 620 (W.D. Tex. 2012). The habitual residence determination "presents a mixed

question of law and fact." *Larbie*, 609 F.3d at 306.

Although Petitioner and Respondent dispute whether *Larbie*'s statement with respect to the

habitual residence determination standard is *dicta* or binding precedent, the Court agrees with

Respondent and concludes that the Fifth Circuit has adopted the "shared intent" standard in *Larbie*

for determining a child's habitual residence. The Court will thus follow *Larbie*'s instruction in

determining M.V.'s habitual residence, giving the greatest weight to the shared intent of the parents

and some consideration of the child's experience.

Petitioner argues that M.V.'s habitual residence at the time of her removal was Mexico.

Respondent disagrees, arguing that M.V.'s habitual residence was–and has been since the time of her

birth–the United States. The dispute over this element involves whether Petitioner and Respondent

ever had a shared intent or settled purpose that M.V.'s habitual residence would be Mexico. It is

clear from the evidence that, at the time M.V. was removed from Mexico, she had been in Mexico

continuously for approximately seventeen months (ages two to four), had attended school, celebrated

birthdays and holidays, had friends and family there, and was well settled and highly acclimatized in

Mexico. The Court thus turns to the most important aspect of the habitual residence determination,

the parents' intent. *See Larbie*, 690 F.3d at 310-11.

### 1.    *United States as M.V.'s Original Habitual Residence*

As an initial matter, Petitioner disagrees with Respondent's method of proving habitual

residence, which Petitioner characterizes as an improper reverse- or cross-claim for wrongful removal.

According to Petitioner, Respondent's theory is that M.V.'s habitual residence at the time of her

birth was the United States and that M.V.'s time in Mexico was due only to *Petitioner's* wrongful retention of M.V. in Mexico. Although Respondent does characterize Petitioner's retention of M.V. in Mexico from January 2011 through July 2012 as wrongful, it is clear that Respondent has not made a cross-claim under the Hague Convention.[10] Further, the Court does not agree with Petitioner that the Court must ignore all previous places of M.V.'s residence prior to the date M.V. was allegedly wrongfully removed by Respondent. Instead, it is clear from the case law that the Court must consider M.V.'s residence as the time she was born and decide when, if ever, the parents agreed to change that residence. Respondent argues that M.V.'s habitual residence at the time she was born was the United States, and never changed from that country despite M.V.'s time in Mexico. Petitioner argues that M.V.'s habitual residence became Mexico at least if not before August 2011.

The Court agrees with Respondent that, at the time of M.V.'s birth, her habitual residence was the United States. M.V. was born in the United States, is a United States citizen, lived in and never traveled outside of the United States from her birth in September 2007 until July 2010, both of M.V.'s parents lived in the United States, neither parent had plans to move to Mexico until Petitioner's arrest, and most of M.V.'s extended family lived in the United States.

2.      *Mexico as M.V.'s Habitual Residence at the Time of Removal*

The relevant issue, of course, is whether Petitioner and Respondent ever shared an intent for M.V. to abandon the United States as her habitual residence and adopt Mexico as her habitual residence. First, Petitioner argues that circumstantial evidence demonstrates that Petitioner and Respondent agreed that M.V. would remain in Mexico permanently, and thus habitually reside there,

---

[10]Article 12 of the Hague Convention generally provides a one-year time frame for raising wrongful removal or retention claims.

on or after January 2011 and in the months that followed. Second, Petitioner argues that, at the very latest, direct evidence establishes that Petitioner and Respondent made an actual agreement in August 2011 that M.V.'s habitual residence would become Mexico. Respondent responds that he never entered into an agreement and that the evidence demonstrates Respondent's repeated objections to M.V.'s remaining in Mexico permanently.

The Court relies on Petitioner's credible testimony that, during Respondent's August 2011 tripe to Linares, Mexico, the pair agreed to alter M.V.'s permanent residence. The fact that Petitioner would be unable to see M.V. if M.V. lived in the United States is a solid and logical reason why the parties agreed that M.V. would remain in Mexico. Petitioner's explanation of the details of the agreement was credible and made sense. Moreover, this version of events is further sustained by the documented evidence that it was only after Petitioner finally rebuffed Respondent as a romantic partner that he began what appeared to be a mean-spirited effort to take M.V. away from Petitioner as retaliation for her rejection of him. The electronic evidence firmly documents this disturbing shift in attitude by Respondent toward Petitioner.

Certainly, at the beginning of Respondent's August 2011 visit to Mexico, it is clear that Respondent was frustrated that M.V. had not been to the United States since January 2011. However, Respondent admitted that M.V.'s length of stay in Mexico was partially due to the fact that M.V. was enrolled in pre-school in Mexico and partially due to the fact that Respondent could not afford to bring M.V. to the United States. Despite the voluminous documentation of daily communication between Petitioner and Respondent, there is nothing to document Respondent's claim that he objected to M.V.'s remaining in Mexico during that time period, despite his self-serving testimony to the contrary at trial. Respondent also impliedly admitted that he did come to an

agreement with Petitioner during the August 2011 trip to Mexico that M.V. would remain in Mexico. Petitioner explained that this agreement was due to M.V.'s schooling and because Petitioner would not be able to see M.V. in the United States. Though he alleges that this agreement was involuntary, Respondent's only evidence in support was his dispute with the Petitioner's male relatives during the August 2011 trip and the fact that M.V. was already enrolled in pre-school for the upcoming school year, which he claimed gave him little choice.

Aside from Petitioner's credible testimony, convincing circumstantial evidence exists to demonstrate that, in addition to the parties' agreement in August 2011 to make Mexico M.V.'s home, Respondent acquiesced to M.V. laying permanent roots in Mexico. This evidence includes the fact that Respondent and his son took trips to visit M.V. in Mexico without incident in November 2011, March 2012, and May 2012. Additionally, Respondent began to increase his financial participation in M.V.'s life in Mexico by the end of 2011 once M.V. was–according to the credible evidence–remaining there. Respondent was looking for a job in Monterrey, Mexico around February 2012 so that he could be nearer to M.V. Pet. Ex. 18. Further, strong circumstantial evidence in the form of messages between the parties indicates that from January 2011 until M.V.'s removal, Respondent did not object to M.V. remaining in Mexico, with the exception of a few occasions, as noted above in the Court's factual findings. Finally, in December 2011 and in June 2012 Respondent left Mexico with M.V. without telling Petitioner, although Petitioner was able to retrieve M.V. in the December 2011 before the bus crossed the border. Sneaking out of the country with M.V. without telling Petitioner does not support Respondent's theory that there was agreement on the removal of M.V. to the U.S.

Respondent attempted to rebut Petitioner's evidence as to their agreement or lack thereof

to change M.V.'s habitual residence to Mexico. He first argues that Petitioner's relatives caused him to involuntarily agree to M.V.'s permanent residence in Mexico. There is no evidence–even from Respondent himself–that the relatives actually threatened Respondent in any way. Instead, Respondent stated only that the relatives told him M.V. would not travel to the United States with Respondent at that time. Moreover, the parties appear to agree that Respondent and Petitioner entered into their agreement *after* the relatives, and hence the alleged threat, were gone. Petitioner's credible testimony established that the parties made a well-reasoned decision as to why M.V. would remain permanently in Mexico, *i.e.*, because Petitioner was unable to travel to the United States. Further, Respondent admitted that he and Petitioner were in a romantic relationship at that point, and the evidence showed that Respondent permitted M.V. to remain in Mexico with Petitioner whenever Petitioner was in a relationship with him. The evidence in support of the fact that Respondent and Petitioner agreed in August 2011 to allow M.V. to remain in Mexico permanently was strong, compelling, and credible. Respondent's testimony downplaying this agreement and emphasizing his ongoing objection to M.V. being in Mexico was not credible or reasonable.

Besides the August 2011 visit, Respondent points to his prior December 2011 visit and attempt to remove M.V. to Mexico at that time as evidence that he continued to object to M.V. staying in Mexico. At times, Respondent states that Petitioner consented to M.V.'s Christmas day return to the United States when, by his own account, Petitioner was very drunk and said M.V. could go back to the United States. At other times, Respondent uses the Christmas day trip as evidence that Petitioner was wrongfully keeping M.V. in Mexico and, because Respondent objected to M.V. in Mexico, he had to try to bring M.V. back to the United States. Although these motivations and explanations are not necessarily mutually exclusive, Respondent paints different

pictures of the December incident.

Respondent also points to Petitioner's alleged desire to return to the United States as evidence that the parties planned for M.V. to go back to the United States. But Petitioner explained that she believed she would be unable to go to the United States due to her immigration status and thus had no plans to return. Respondent also noted that M.V. had only brought "one suitcase" with only a few clothes on her trips to Mexico, as evidence that her stay was to be short. However, Petitioner explained that all of M.V.'s things were in Mexico or were subsequently sent to Mexico from the United States by her mother. Further, when M.V. visited the United States from Mexico, she also only brought one suitcase. Respondent's theories were thus not compelling.

Respondent's objection or consent to M.V.'s residing permanently in Mexico appears to be based on whether Petitioner was in a relationship with him. Ultimately, however, once both parties exerted a contemporaneous shared intent during the August 2011 visit for M.V. to remain permanently in Mexico, at that time M.V.'s habitual residence was changed to Mexico. Any later change of heart by Respondent is ineffectual unless accompanied by Petitioner's shared intent to change M.V.'s habitual residence back to Mexico. Clearly, that did not occur as Petitioner's testimony established that she never intended for M.V. to move back to the United States.

In conclusion, the Court decides that the evidence and credible witness testimony demonstrates Petitioner's and Respondent's agreement and shared intent to shift M.V.'s habitual residence to Mexico at least by August 2011. There is no evidence that M.V.'s habitual residence changed from Mexico after this time. Thus, at the time of M.V.'s removal, her habitual residence was Mexico.

ii.      Breach of Custodial Rights

Since Petitioner successfully proved by a preponderance of the evidence that Mexico was M.V.'s country of habitual residence, the "question becomes whether the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws." *Larbie*, 690 F.3d at 307; *Gallardo*, 2013 WL 3803905, at *5. "Rights of custody" include a parent's right to determine the child's place of residence. *Abbott v. Abbott*, 560 U.S. 1, 130 S. Ct. 1983, 1989 (2010) (citing Article 5(a) of the Hague Convention).

Because the Court has determined that Mexico was M.V.'s country of habitual residence prior to her removal, the Court must apply Mexican law to determine whether Petitioner's custody rights were breached by Respondent's removal of M.V. to the United States without Petitioner's consent.[11] The parties agree that the Civil Code for the State of Nuevo Leon provides the applicable law regarding Petitioner's custody rights.

Article 414 of Title Eighth: On Parental Authority/Responsibility (*Patria Potestas*) of the Nuevo Leon Civil Code provides, in relevant part, that "[p]arental authority/responsibility (*patria potestas*) is exerted jointly by both parents." Both parties agree that Petitioner and Respondent each had parental authority over M.V. under Article 414. Article 414 bis mandates:

> In all cases where the mother does not live with the father of her children, she will have the right of preference to keep the children under seven years of age under her care, unless she practices prostitution, pimping or habitual drinking, suffers from a contagious disease or her antisocial behavior represents a serious danger for the health and morality of the children.

Also relevant is Article 421, which states:

> As long as the child is under parental authority/responsibility (*patria potestas*), he or she shall not leave the house of those who exert it without their permission or by

---

[11]The Court's conclusion that Petitioner did not consent to M.V.'s removal is explained *infra*.

-37-

means of an order emitted by an authority legally qualified to do so.

Each party presented its own expert witness in support of their positions with respect to the interpretation of Nuevo Leon law. The experts opined on the meaning of the Nuevo Leon Civil Code and discussed hypotheticals applicable to this case. Appropriately, neither expert gave an ultimate conclusion as to the outcome of Petitioner's Hague Convention claim.

Due to scheduling needs, Respondent's expert, Ignacio Pinto-Leon, testified before Petitioner's expert. In Mr. Pinto-Leon's opinion, Article 414 of the Nuevo Leon Civil Code provides equal parental authority, or *patria potestas*, for both parents, regardless of whether the parents are married, living together, or even living in separate countries. Petitioner's expert, Mariano Nuñez Arreola, agreed with that proposition under Article 414. He testified that *patria potestas* rights include deciding where the child will go to school, if a child will go to a hospital or have an operation, where the child will live, etc.

Mr. Nuñez Arreola concluded that, despite parents' joint authority over a child, under Article 414 bis of the code, Petitioner had a preferential right in choosing where M.V. lived, given that Petitioner and Respondent did not live together and given that M.V. was younger than seven years old. Mr. Pinto-Leon, on the other hand, believed that Article 414 bis did not apply to this case. Specifically, Mr. Pinto-Leon stated that he relied on the Spanish version of the statute,[12] and in his opinion the right of preference given to a mother under Article 414 bis applies only in a custody proceeding.

---

[12]The parties submitted the English version of the State of Nuevo Leon Civil Code, upon which the Court relies. To the extent Mr. Pinto-Leon testified that the English version was either outdated or incorrect, neither he nor Respondent's counsel supported that testimony with evidence or a different translation. Respondent himself never objected to the English version of the code submitted to the Court.

The interpretative disagreement between the experts extended into their understanding of how the Nuevo Leon Civil Code handles conflicts between parents who are separately exercising their *patria potestas* rights and doing so in opposition with each other. Mr. Pinto-Leon testified that, through his understanding of the Civil Code, parents can exercise their *patria potestas* to the exclusion of the other parent without any requirements or remedies under the code. In other words, Mr. Pinto-Leon believed that the Civil Code permits a father to abduct a child from the mother, and the mother to abduct the child from the father, and so on, without either parent being in violation of the other parent's rights. Although parties in conflict can obtain a custody order to resolve conflicting parental authority, Mr. Pinto-Leon stated that nothing in the law prohibited or governed conflicting parental authority or required the parties to obtain a custody order when in conflict.

In response to Respondent's expert's opining on conflicting parental authority, Mr. Nuñez Arreola explained a different interpretation of the law. As noted above, Mr. Nuñez Arreola stated that a single mother with a young child, such as Petitioner, has the right of preference to keep her child in her care pursuant to Article 414 bis. Further, Mr. Nuñez Arreola explained that, when two parents are utilizing their parental authority in conflict with each other, they must either come to a voluntary agreement between themselves (preferably in writing, though no writing is required), or they must seek a court custody order. Mr. Nuñez Arreola opined that a parent may not abduct a child from another parent or exercise other self-help remedies when parents conflict. Specifically, Mr. Nuñez Arreola pointed to Article 421, which, in his interpretation, prohibits a child from being taken from his or her residence without the consent of the parent or parents who reside there or a court order. Mr. Pinto-Leon disagreed that Article 421 applied to this case, opining that Article 421 prohibited children from running away from their parents and did not apply to parents or anyone else

who abducts a child. Mr. Pinto-Leon stated that the statutes do not provide for cases where a parent abducts a child from another parent. Mr. Nuñez Arreola responded to Mr. Pinto-Leon's assertion by stating that, in addition to the prohibitions on unilateral abduction from a parent under Article 421, there are criminal consequences for a parent or other family member who unilaterally abducts or illegally retains a child. Mr. Nuñez Arreola pointed the Court to the Nuevo Leon Civil Code, Article 284, Chapter 6 on abductions of minors, which supposedly offers a two- to five-year sentence of imprisonment for abduction of a minor by a family member.

The Court found Mr. Nuñez Arreola's testimony and interpretation of the civil code to be logical, reasonable, and convincing. On the other hand, Mr. Pinto-Leon's explanation that Mexican law permitted single parents to abduct a child from the other parent without criminal or civil consequences was untenable and unreasonable in light of common sense and the plain language of the texts provided to the Court.[13]

The Court thus applies the Nuevo Leon Civil Code and Mr. Nuñez Arreola's interpretation of the code to this case. From the time that Mexican law applied, *i.e.*, once M.V.'s habitual residence became Mexico, Petitioner as a single mother of a child under the age of seven had the right of preference to keep M.V. in her care.[14] *See* Article 414 bis. M.V. was in Petitioner's care from July to October 2010 and from January 2011 until M.V.'s removal in June 2012. In order to remove M.V.

---

[13]It is possible that Mr. Pinto-Leon did not understand the factual posture of this case and the precise issues facing the Court, given that he admitted that in preparing for this case, he read only Respondent's Answer and Mr. Nuñez Arreola's affidavit, but not the Verified Petition or any other documents, which he stated were not provided to him.

[14]Respondent noted in his Response to Petitioner's trial brief that Petitioner had a prior conviction. Respondent stated that Petitioner has not shown whether the facts of the conviction constitute antisocial behavior that negates the right of preference in Article 414 bis. Doc. 52, Resp. at 2-3. However, Respondent did not argue this at trial or otherwise raise the issue.

from her mother's care in Mexico and take her to the United States, Respondent was required to obtain either a custody order from a Mexican court or the agreement of Petitioner. Because Respondent did not receive the consent or agreement of Petitioner to relocate M.V.[15] or a custody order from a court in Mexico, Respondent was in violation of Article 421 of the Civil Code and breached Petitioner's right of preference to keep M.V. in her care under Article 414 bis. Accordingly, the Court concludes that Petitioner's custody rights under the State of Nuevo Leon Civil Code were breached when Respondent unilaterally removed M.V. from Petitioner's care without Petitioner's consent and without a custody order from a Mexican court of jurisdiction. Petitioner has thus made the requisite showing under the second element of her *prima facie* case.

### iii. Actual Exercise of Custodial Rights

Prior to trial, the parties agreed that Petitioner was actually exercising her custody rights over M.V. at the time Respondent removed M.V. to the United States in June 2012. *See Larbie*, 690 F.3d at 307 (noting that it is "relatively easy" to make this final showing and that courts "liberally find" that rights of custody were actually exercised). The parties therefore do not dispute that Petitioner has met her *prima facie* burden to prove her actual exercise of custodial rights by a preponderance of the evidence.

### iv. *Prima Facie* Conclusion

In conclusion, the evidence and credible witness testimony demonstrated by a preponderance of the evidence that M.V.'s habitual residence at the time of her removal in June 2012 was Mexico, that Respondent breached Petitioner's custodial rights by removing M.V. from Mexico, and that

---

[15]The Court's discussion of and conclusion as to Petitioner's lack of consent appears *infra*.

Petitioner was actually exercising her custodial rights at the time of M.V.'s removal. Accordingly, the Court concludes that Petitioner has met her *prima facie* burden under Article 3 of the Hague Convention and under the ICARA for a claim of wrongful removal and retention.

B.    *Respondent's Affirmative Defenses*

Should a petitioner meet his or her *prima facie* burden under Article 3, the respondent parent has the burden to present and prove affirmative defenses or exceptions to the requirement that the child be returned. These defenses include (1) if the petitioner consented to the removal, (2) "if there is a 'grave risk' that return will result in harm" to the child, (3) if the child has reached an age and degree of maturity and objects to return, and/or (4) "if return would conflict with fundamental principles of freedom and human rights in the state from which return is requested." *Chafin*, 133 S. Ct. at 1021. Because Petitioner has met her *prima facie* burden for a claim of wrongful removal and retention, it is Respondent's burden to bring any affirmative defenses to avoid returning M.V. to Mexico. At various times throughout the pre-trial and trial stages of this case, Respondent has alleged that Petitioner consented to M.V.'s removal, that M.V.'s return to Mexico will result in grave risk to M.V., and that M.V. is of an age and maturity that her preference as to place of residence should be taken into account. The Court addresses each of these defenses, in turn, below.

i.    Petitioner's Consent

Respondent's first affirmative defense alleges that Petitioner consented to Respondent's removal of M.V. from Mexico in June 2012. Article 13a of the Hague Convention establishes that a judicial authority is not required to return a child if the petitioner "had consented to or subsequently acquiesced in the removal or retention." Respondent's burden of proof on this consent defense is a preponderance of the evidence standard. 42 U.S.C. § 11603(e)(2)(b). "In examining a

consent defense, it is important to consider what the petitioner actually contemplated and agreed

to in allowing the child to travel outside its home country." *Larbie*, 690 F. 3d at 309 (internal

quotation marks omitted). "The nature and scope of the petitioner's consent, and any conditions or

limitations, should be taken into account." *Id.* It appeared to the Court that Respondent argued that

the defense applied to Petitioner's pre-removal consent to allow M.V. to return to the United States.

However, because some evidence was introduced by Respondent regarding whether Petitioner later

acquiesced to Respondent's removal of M.V., the Court will analyze that possible defense out of an

abundance of caution. As such, the parties' conduct both before and after the June 2012 removal

is relevant to the Court's analysis.

  1.  *Respondent's Theory of Consent*

   In support of the consent defense, Respondent raises a theory that Petitioner agreed to permit

Respondent to take M.V. to Mexico with him if Respondent would buy Petitioner a car and give her

cash. In support of this theory, Respondent presents his testimony and the testimony of his son. Both

stated that the purpose of their June 2012 trip to Reynosa, Mexico was to take M.V. back to the

United States in exchange for giving Petitioner a car and cash. Respondent stated that the car was

*for M.V.* (even though M.V. could not yet drive and the car would be used by Petitioner), because

M.V. asked for it and Respondent would not say "no" to M.V. However, if the plan was to swap M.V.

for the car, why would Respondent buy a car *in Mexico* for M.V. in exchange for taking M.V. to the

United States where she would not have access to the car? Further, the evidence showed that

Respondent stated at various times that he had bought a car in Mexico, that he had partially paid

for a car in Mexico, or that they were just going to look at cars in Mexico.[16] It is clear that there was

no car. Neither Respondent nor his son presented credible testimony, given that their stories differed

from each other, their stories differed from their own prior deposition testimony, and given that their

stories just did not make any sense. Respondent's evidence is insufficient to show that Petitioner

consented to Respondent taking M.V. to the United States in June 2012.

        2.    *Petitioner's Evidence of Lack of Consent*

In opposition to Respondent's evidence, Petitioner testified that there was not an agreement

to allow M.V. to go back to the United States with Respondent and Respondent's son. Petitioner

testified that she, her uncle, and M.V. traveled to Reynosa in order to pick up a car that Respondent

had purchased for them. According to Petitioner, Respondent's decision to buy a car in Mexico was

based on a request from M.V. To corroborate her testimony, Petitioner presented messages between

Respondent and Petitioner indicating that Petitioner did not care whether Respondent bought a car

because Petitioner had not had a car for three years and could continue to take buses and taxis. Pet.

Ex. 18. Further, in late May 2012 Petitioner stated that she was not going to bring M.V. to Reynosa

because the drive from Linares to Reynosa was dangerous and she was "scared" and didn't want to

"risk" M.V. Pet. Ex. 18, 19. Respondent's only response to M.V. not coming was that he wanted to

spend time with her. Pet. Ex. 19. Common sense provides that if the parties had agreed to exchange

the child for the car, Petitioner would not have refused to bring the child to the exchange or

Respondent would have objected to the fact that the child was not coming to be handed over to him.

---

[16]In a yahoo message conversation over several days, Respondent changed his story from alleging that
he was just looking at cars to the fact that he had already bought a car to the fact that he had only paid some
of the fees to he was still looking at cars. Pet. Ex. 18, 19.

The parties also discussed several times a way that Respondent could "see" M.V. in Mexico during the car exchange since Petitioner did not want to take M.V. to Reynosa; this language appears to support the idea of a visit by Respondent, rather than a trip for him to take M.V. away to the United States. Pet. Ex. 19.

Petitioner also presented credible, compelling, and consistent evidence in the form of her testimony and other documents of the events surrounding M.V.'s removal and all that she did after realizing that M.V. was gone. Petitioner credibly explained that the day of the abduction that, after she followed the false trail left by Respondent through his messages for two to three hours, she: (1) spoke with members of the military who were nearby, who told her to go to the border; (2) went to the border and was told that, due to the time delay, there was nothing the border patrol could do on either side of the border; (3) went to the local Reynosa police station, who informed her that she needed to go to the Attorney General's office to fill out an abduction report; (4) needed to go to the Attorney General's Office of the Family Division but learned that it was closed that day; (5) filed an abduction report on Tuesday[17]; and (6) filed a Hague Convention petition shortly thereafter. Petitioner's sister's and grandmother's testimony corroborated this account. Further, Respondent's text messages to Petitioner's sister imply that M.V. was abducted, rather than removed with Petitioner's consent.

---

[17]Respondent argues that Petitioner's four-day delay in filing the abduction report evidences her consent to M.V.'s removal. Far from circumstantially establishing that Petitioner consented to M.V.'s removal by delaying the filing of her abduction report, instead the credible witness testimony establishes that Respondent misled Petitioner into thinking that he had just taken M.V. out for a treat for long enough for Petitioner to be unaware and stop him before crossing the border to the United States, as she had done in December 2011. Further, the fact that the office for reporting abductions was closed and thus Petitioner was unable to immediately file an abduction report is not a fact attributing to Petitioner's fault or intent.

In addition to the evidence of Petitioner's consent or lack thereof on or around the time M.V.'s June 2012 removal from Mexico, Petitioner presented additional evidence demonstrating a history of her lack of consent to M.V.'s removal from Mexico and a history of Respondent's attempts to trick Petitioner and abduct M.V. The evidence of the Texas custody proceedings provides strong evidence of Respondent's attempt to obtain M.V. without the knowledge or consent of Petitioner. Specifically, Respondent initiated custody proceedings in Texas around February 2012 but did not inform Petitioner of the custody proceedings. Far worse than that, Respondent seriously misrepresented his knowledge of Petitioner's whereabouts to the Texas court. Courts have explained that "the timing of and the surreptitious manner in which [a respondent] served process [for a prior custody proceeding] on [a petitioner] undercuts his credibility" in arguing that the petitioner consented to a child's removal. *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 628 (W.D. Tex. 2012). "[T]he deliberately secretive nature of the actions of the removing parent is extremely strong evidence that the other parent would not have consented to the removal." *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (internal alterations omitted) (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)). Petitioner logically argues that, the fact that Respondent conducted these proceedings in Texas without her knowledge and with the apparent intent to keep Petitioner from the proceedings, *i.e.*, by misspelling of her name and not disclosing her whereabouts, demonstrates that Respondent knew that Petitioner did not consent to M.V. moving to Texas with Respondent permanently.

Petitioner also points to the prior December 2011 abduction of M.V. by Respondent, which prompted Petitioner to involve the Mexican police to obtain M.V., as evidence that Petitioner continuously refused her consent to Respondent's taking M.V. to the United States. Importantly,

just weeks prior to his attempt to take M.V. to the United States, Respondent and his cousin sent messages about "tricking" Petitioner by taking M.V. and then not returning her. Additionally, Petitioner points to threats made by Respondent to Petitioner against Petitioner and Petitioner's family as evidence demonstrating that Respondent continues to use M.V. against Petitioner and not within Petitioner's consent.

Far from establishing consent by a preponderance of the evidence, the credible evidence presented at trial demonstrates that Petitioner did <u>not </u>consent to M.V.'s removal to the United States in June of 2012.

### 3.    Lack of Subsequent Acquiescence

Finally, Respondent appeared to present evidence demonstrating that Petitioner later acquiesced to M.V.'s removal, though Respondent did not expressly raise this alleged subsequent acquiescence as an affirmative defense. Out of an abundance of caution, the Court will consider the defense.

Respondent testified that Petitioner has stated since her departure from the United States that she wanted to return to the United States. Lorenzo Dillon also testified that, prior to M.V.'s removal, Petitioner was looking into the procedures and fines necessary to return to the United States. Evidence was submitted that Petitioner's sister wanted Petitioner to come back to the United States, and Petitioner stated that she knew that. Petitioner addressed these allegations head-on, stating that she did not want to return to the United States unlawfully. Indeed, she stated that if she wanted to return to the United States unlawfully, she would have done so already so that she could see her daughter. The Court notes that the evidence and testimony presented primarily demonstrated Petitioner's desire or consideration of return to the United States, but only through

lawful means and prior to M.V.'s removal. The Court cannot agree that Petitioner's alleged desire to return to the United States equates with a post-removal acquiescence of M.V.'s removal there.

Respondent also pointed to the romantic statements made by Petitioner and requests for money from Respondent for, *inter alia*, a dentistry procedure that post-date M.V.'s removal. Petitioner explained that any romantic statements she has made to Respondent since M.V.'s removal were made so that Respondent would allow her to speak with M.V. The evidence, including Petitioner's and Diana's testimony, as well as numerous messages between Petitioner and Respondent, corroborate Petitioner's explanation in showing that Respondent holds M.V. against Petitioner, forcing Petitioner to indicate her willingness to be in a relationship with M.V. in order for Petitioner to get to speak with M.V. The evidence of any romantic statements from Petitioner to Respondent simply does not support a theory that Petitioner later acquiesced to Respondent's removal of M.V. from Mexico.

ii.      Grave Risk

Respondent next raises the "grave risk" defense. Under Article 13b of the Hague Convention, a judicial authority is not required to return a child, despite a finding that the child was wrongfully removed, if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." "[A] grave risk or intolerable situation exists where return of the child would send the child to a 'zone of war, famine, or disease,' or in cases of serious abuse or neglect." *Vazquez v. Estrada*, 3:10-CV-2519-BF, 2011 WL 196164, at *5 (N.D. Tex. Jan. 19, 2011) (citing *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003), and *Friedrich*, 78 F.3d at 1069). "A grave risk of harm can be established when return of the child to the country of habitual residence puts the child in 'immediate danger prior to resolution' of

the underlying custody dispute." *Gallardo*, 2013 WL 3803905, at *13. Respondent has the burden

of proving grave risk with clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A). "A high

threshold exists for establishing the grave risk of harm defense." *Gallardo*, 2013 WL 3803905, at

*13.

Respondent raised three reasons why he believed returning M.V. to Mexico would result in

grave risk to her. First, Respondent put forth testimony from himself and his mother Ramona

Vasquez alleging that, when Petitioner was arrested in January 2010, M.V. was left at J.C. Penney

with a store employee and her diaper was very soiled. Doc. 30, Resp't Trial Br. at 14-15. The

evidence of the incident of Petitioner's arrest does not constitute clear and convincing evidence of

grave risk to M.V. if she is returned to Mexico. First, the incident does not involve the sort of

"serious abuse or neglect" as contemplated by the Hague Convention. *See Munoz v. Ramirez*, No.

MO-12-CV-00082-DC, 2013 WL 563419 (W.D. Tex. Jan. 25, 2013) (evaluating claim of grave risk

to the child at issue due to sexual abuse of a sibling by the Petitioner's boyfriend, and finding no

grave risk); *Danaipour v. McLarey*, 386 F.3d 289, 301 (1st Cir. 2004) (finding grave risk of return to

father who sexually abused the children at issue). Second, although M.V.'s being left with a store

employee was indeed a product of Petitioner's arrest, the police officers made the decision to leave

M.V. with the store employee and Respondent himself admitted that he did not go directly to the

store upon learning that he needed to pick up M.V. There were thus contributing factors to M.V.'s

being left with a stranger and having a dirty diaper. Third, Respondent did not provide evidence of

alleged neglect other than this single incident. Though Respondent did testify that he believed M.V.

was left with friends and family while living in Mexico, that testimony was not credible nor indicative

of neglect. Petitioner's credible testimony established that M.V. is either in Petitioner's care, at

school, or with Petitioner's grandmother Rebeca Alanis. This testimony was also corroborated by Ms. Alanis. Respondent also mentioned Petitioner's habits regarding drinking alcohol. This appears to be more of an attempt to argue whether Petitioner is a good parent rather than whether grave risk exists for M.V. in Mexico. *See, e.g., Saldivar v. Rodela*, 879 F. Supp. 2d 610, 629 (W.D. Tex. 2012) (discussing the grave risk exception and explaining that "because courts are not to determine the merits of the underlying custody dispute, it is not relevant who is the better parent in the long run" (internal quotation marks and alterations omitted)); *Hirst v. Tiberghien*, No. 6:13-cv-00729-JMC, 2013 WL 2359510 (D.S.C. May 3, 2013) (rejecting claim of grave risk based on alleged sexual, physical, and emotional abuse of the children and neglect of the children due to the petitioner's alleged drinking, smoking, foul language, sleeping late, allowing the children to walk to school on a busy road by themselves, and allowing the children to go out all night by themselves). The Court thus rejects Respondent's theory of grave risk due to abuse and neglect.

Next, Respondent alleges that Mexico is a dangerous country and M.V.'s return there would put her at grave risk. Doc. 30, Resp't Trial Br. at 14-15. The sole evidence presented at trial in support was Respondent's own testimony that there have been shootings in Linares, Mexico, where Petitioner lives. On cross examination, however, Respondent admitted that he had only read or heard of the shootings and was unaware of the circumstances surrounding the shootings. This evidence falls far short of the standard for proving grave risk to M.V. in Mexico. *Silverman v. Silverman*, 338 F.3d 886, 901 (8th Cir. 2003) (holding that no grave risk existed where "the evidence centered on general regional violence, such as suicide bombers, that threaten everyone in Israel"); *Vazquez v. Estrada*, No. 3:10-CV-2519-BF, 2011 WL 196164, at *5 (N.D. Tex. Jan. 19, 2011) (finding no grave risk due to alleged "spiraling violence and surge in murders in Monterrey[,

Mexico]" and "specific violent acts" that were committed in the child's school and her neighborhood in Mexico).

Finally, Respondent argues that M.V. will be put at grave risk in Mexico because Petitioner cannot afford electricity and food. As evidence in support, Respondent submitted a message from Petitioner to Respondent requesting that Respondent send money for M.V. because M.V. "is the one suffering w[ith] no food soon to be no electricity." Resp't Ex. 4. Respondent also provided evidence of a bank statement from one bank account of Petitioner indicating that the account held less than one dollar. Petitioner's credible testimony clarified these matters. Petitioner first testified that, although she sent the message stating that they would not have food and electricity unless Respondent sent money, the message was not true but merely sent "to make him feel bad" because Respondent had failed to provide financial assistance for M.V. at that point in time. Petitioner stated that she was always able to feed M.V. and provide for more than her basic needs, including sending M.V. to a private school. Petitioner also explained that the bank account pointed to by Respondent was an account that she had set up for direct deposit of her wages from a prior employer and that, at the time the account had low funds, she was no longer working for that employer or using that bank account. Respondent's evidence of grave risk in this respect is minimal and, in any event, was negated by Petitioner's credible explanations.

Respondent did not raise any other theory of "grave risk" in his Trial Brief. Doc. 30, Resp't Trial Br. at 15. To the extent that Respondent's evidence was intended to support further theories of grave risk not specifically mentioned in his brief, the Court concludes that the evidence presented at trial does not support Respondent's burden of proving grave risk.

iii.    Mature Child Objection

Another defense raised by Respondent in his pre-trial briefing involves a mature child's objection to his or her return to the country of habitual residence. Under Article 13 of the Hague Convention, a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." "The Convention does not set an age at which a child is automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007). This exception "is to be applied narrowly," and the child's maturity must be proved by a preponderance of the evidence. *England v. England*, 234 F.3d 268, 272 (5th Cir. 2000); 42 U.S.C. § 11603(e)(2)(b).

Respondent did not raise the mature child objection in his Trial Brief (doc. 30), instead noting that the mature child objection is an issue that is better addressed after the trial. The assertion that an affirmative defense is better addressed after a trial has been completed is nonsensical. In any event, prior to trial, Respondent moved for an *in camera* interview of M.V., which Respondent sought to occur after and only upon the possibility that Petitioner proved her *prima facie* case. *See* doc. 42, Mot. Petitioner had objected to the motion, only in that Petitioner wanted the interview to occur during the pre-trial setting. The Court granted in part and denied in part the request for an *in camera* interview, holding that "such an interview will not be held prior to trial but only at the time such an interview becomes necessary" but explaining that "the Court declines to decide at this time whether it should hold an in camera interview with the Child." Doc. 68, Order at 2.

Importantly, neither party ever requested that the Court interview M.V. during trial or after the close of evidence. Nor did either party list M.V. as a witness in their witness lists. Indeed, the only evidence related to the mature child objection was testimony elicited from the parties and

several family members that they believe M.V. is "intelligent." At the time of trial, M.V. was a mere five (5) years old and had not yet attended kindergarten. The parties have identified cases permitting children as young as eight or nine years old to state a preference, but have not identified cases of children as young as M.V. testifying or being interviewed on this matter.

Most importantly, even if M.V. was mature enough to testify, which the Court concludes she was not by virtue of her age and limited schooling, Petitioner presented evidence that M.V. has been unduly influenced by Respondent. Evidence was presented in the form of voxer messages from Respondent and M.V. to Petitioner, wherein Respondent referred to Mexicans using a derogatory term and made severely disparaging remarks regarding Petitioner to M.V. Among the relevant recordings, Respondent stated to M.V. that Petitioner "don't contact us," "don't talk to us," "don't care about us," "don't care," and "don't call for you," that Petitioner could contact M.V. but instead chooses to contact her friends, and that Petitioner just wants money. Further, Petitioner testified that her only point of access to M.V. was through Respondent, and she believed that Respondent was failing to give Petitioner's messages to M.V. so that M.V. will think that her mother does not care about her. Even if the Court concluded that M.V. was of an age and maturity to give a statement regarding her objection or not to returning to Mexico, which the Court does not so conclude, there is sufficient evidence demonstrating that M.V.'s knowledge and perception of Mexico has been unduly influenced by Respondent.

iv.      Conclusion on Affirmative Defenses

Because the Court holds that Respondent has not met his burden with respect to any of his affirmative defenses, the Court discerns no valid reason for withholding the return of M.V. to Mexico.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Petitioner Ana Carolina Vazquez's Verified Petition Under Hague Convention for Return of Abducted Child (doc. 2), filed on April 11, 2013. Given that Respondent has **wrongfully withheld** M.V. from Petitioner for over one year, the prompt return of M.V. to Mexico is of the utmost importance to M.V., to Petitioner, and to the Court. The Court enters the following orders to ensure that nothing will interfere with M.V.'s return to Petitioner in Mexico. The parties are admonished that **NO EXTENSIONS OF TIME WILL BE GRANTED**. In determining the deadlines outlined below, the Court explicitly notifies the parties that weekend days and holidays, including the upcoming Labor Day, shall not be excluded from the date calculations. Failure to follow this Court's orders will result in sanctions against counsel and the parties.

It is therefore **ORDERED** that the child of Petitioner and Respondent, M.V., shall be returned to Mexico **WITHIN THIRTY (30) DAYS OF THE DATE OF THIS ORDER,** at which time a custody proceeding may be initiated in Mexico by the parties to determine their custody rights over M.V. Failure of Respondent to return M.V. to Mexico by that deadline will require the Court to direct the United States Marshal Service to take physical custody of M.V. and will result in serious sanctions, including but not limited to contempt of court.

It is further **ORDERED** that neither the Respondent, nor anyone on his behalf, shall remove M.V. from the Northern District of Texas, Dallas Division, pending M.V.'s return to Mexico. If Respondent, or anyone on his behalf, does remove M.V. from this Court's geographical jurisdiction, even for short period of time, other than during the period of time necessary to take M.V. directly

to Mexico, severe sanctions shall be imposed, including, but not limited to, arrest and incarceration for contempt of court. The Court will not hesitate in directing the United States Marshal Service to take physical custody of M.V. if this Court suspects that a risk of flight exists.

It is further **ORDERED** that the parties shall agree as to the method of transporting M.V. to Mexico, given that Petitioner is unable to come to the United States to pick up M.V. Arrangements should be made to transport M.V. from her father's care in the United States to her mother's care in Mexico. Only Respondent and other individuals explicitly authorized in writing by Petitioner shall be permitted to take M.V. to Mexico to her mother's care. Unless the parties agree otherwise, Petitioner shall incur the cost of transporting M.V., but no one else, to Mexico. The cost of this transportation is subject to reimbursement under the Hague Convention and/or ICARA.

It is further **ORDERED** that the parties shall file a joint report **NO LATER THAN TWO (2) DAYS** prior to M.V.'s return to Mexico, giving the Court notice of the exact method and timing of M.V.'s transportation. As soon as possible, but **NO LATER THAN THREE (3) DAYS** after M.V.'s return to Mexico, the parties shall jointly file a notice with the Court informing the Court that M.V. has been safely delivered to Petitioner's care in Mexico.

It is further **ORDERED** that Petitioner shall file, on or before **MONDAY, OCTOBER 21, 2013**, any motion for reimbursement of costs or fees under the Hague Convention or the ICARA, if she chooses to do so. After receiving complete briefing on the issue, the Court will determine the appropriate monetary award of attorney's fees and costs, if any.

It is finally **ORDERED** that this Court shall retain jurisdiction over this matter until such time M.V. is returned to Mexico and the matter of attorney's fees and costs is resolved. However, the case is now closed. The case and all filings will remain under seal.

SO ORDERED.

SIGNED: August 27, 2013.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE